**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| CITY OF HOLLYWOOD POLICE OFFICERS' RETIREMENT SYSTEM, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> SPROUT SOCIAL, INC., JUSTYN HOWARD, RYAN BARRETTO, and JOE DEL PRETO, <br><br> Defendants. | **CASE NO.:** <br><br> **DEMAND FOR A JURY TRIAL** |

**CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff City of Hollywood Police Officers' Retirement System ("Plaintiff"), by and through counsel, alleges the following upon information and belief, except as to allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes, without limitation: (a) review and analysis of public filings made by Sprout Social, Inc. ("Sprout Social" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants (defined below) and other parties; (c) review of news articles, shareholder communications, and conference calls concerning Defendants' public statements; and (d) review of other publicly available information concerning the Company and the Individual Defendants (as defined herein).

1

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons and entities who purchased or otherwise acquired Sprout Social securities between November 3, 2021 and May 2, 2024, inclusive (the "Class Period"), against Sprout Social and certain of its officers and executives, seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.      Based in Chicago, Illinois, Sprout Social is a software company that offers a centralized platform for businesses to manage social media marketing and operations.  The Company generates revenue primarily from subscriptions to its social media management platform under a software-as-a-service model.  When Sprout Social became a public company in 2019, 60% of its business consisted of smaller customers on month-to-month contracts, while a smaller portion of its business mix consisted of mid-market or enterprise customers.

3.      Leading up to the Class Period, Sprout Social began to change its business mix, targeting larger customers for annual contracts.  For example, on May 5, 2021, the Company noted the shift to a "50-50 split between month-to-month and annual contracts[,]" with Defendants expecting to "see that widening over the longer term."

4.      Throughout the Class Period, Defendants touted "continued momentum in the mid-market and enterprise and our ability to kind of go upmarket," as it transitioned to larger customers that would sign annual contracts.  In making this transition, Defendants highlighted the Company's "unique go-to-market strategy" and that "execution from the sales organization has been really strong.  Indeed, when asked on February 22, 2022 if there were any impediments to "landing larger customer deals[,]" Defendant Justyn Howard ("Howard"), the Company's co-founder and current Chief Executive Officer ("CEO") emphasized that "***we're well equipped for the deals that***

*are out there. . . . **So there's not anything that we would look to and put on the board as deficiencies[.]***"

5.     During the same call, Company President Ryan Barretto ("Barretto") assured investors that Sprout Social's deals with these larger customers were "still running at a sales cycle that runs between 30 to 45 days on average."  Defendants repeatedly assured investors that Sprout Social was "keeping the sales cycles moving quickly" while the Company changed the mix of its customer base, and that the larger customers "land with similar costs and similar sales cycles as the rest of our customer base."

6.     Unbeknownst to investors, however, Sprout Social did not have the structural ability to sell its software to enterprise customers and thus could not execute on its purported go-to-market strategies for enterprise customers.  Further, and as was only revealed to investors at the end of the Class Period, the Company had seen "lengthening of [its] sales cycles as the composition of the customer base and the prospect base [had] chang[ed]" and had seen "longer-type sales cycles, [requests for proposals ("RFPs")], for example, from larger companies that are going to be back-end loaded."

7.     The truth was partially revealed to investors on August 3, 2023.  After the markets closed that day, Sprout Social lowered its full-year revenue and non-GAAP operating income guidance and announced it had acquired Tagger Media, Inc. ("Tagger"), a leading influencer marketing and social intelligence platform used by enterprise customers, for $140 million—a purchase price analysts thought to be "steep."  In a conference call that day, Defendants disclosed that Sprout Social acquired Tagger because the Company lacked the ability to provide influencer marketing even though "influencer [marketing was] a ***customer requirement showing up in more than half of our enterprise conversations***."  Thus, Defendants admitted that, despite years of

promoting Sprout Social's ability to land larger enterprise clients, the Company could not even address a critical need required by the majority of its target market.

8.     Indeed, analysts at Cantor Fitzgerald wrote that the acquisition "further complicates the story, as there is a lot of noise surrounding [Sprout Social's] customer count and go-to-market strategy."  Accordingly, the analysts could not "***overlook the opportunity cost associated with a $140m purchase price for a company that is projecting ~$6m of revenue in 2023E*** [estimated ("E")] and ~$15m in revenue for 2024E" as Sprout Social "***is likely to pay more in interest expense in 2024E [$6-8m] than the revenue that Tagger is going to generate in 2023E (~$6m)***."  Piper Sandler analysts explained that, given the acquisition, the "biggest outstanding question is on the enterprise pipeline in the back half" of the year.  Analysts at CG Capital Markets similarly queried whether Sprout Social was "making an acquisition to mask deteriorating growth."

9.     The market agreed with the analysts, as the next trading day, Sprout Social's stock price fell 12.3%, from a closing price of $53.38 per share on August 3, 2023, to a closing price of $46.81 per share on August 4, 2023.  However, the Company continued to misrepresent its ability and success in shifting its customer mix to larger, mid-market and enterprise customers.

10.     For example, during the Company's Investor Day conference on September 27, 2023, in response to an analyst question as to whether Sprout Social had the ability to serve both its large and smaller customer base, President Barretto explained that the Company "***felt really great about the capacity that we had in places like mid-market and enterprise and places like solution engineering that support the enterprise and places like customer success that we're supporting some of our larger customers***."  Then, during an earnings call held on February 20, 2024, in response to a similar question about Sprout Social's ability to sell to enterprise clients asked, President Barretto again explained that "***a lot of that transition was happening through***

4

'*23*" and that the Company previously accomplished the "***redeployment of our resources towards those sophisticated customers in the core***."

11.     Then, after the close of the markets on May 2, 2024, the truth was fully revealed when Sprout Social issued a press release announcing a $20 million downward revision to the Company's revenue guidance for the year.  The press release noted that the Company had endured "self-induc[ed] sales execution headwinds."

12.     During the corresponding earnings call that day, Defendants disclosed that the Company "made several important strategic decisions heading into [the first quarter]" that included "building new vertical sales teams, accelerating promotions in our mid-market and enterprise teams, adjusting our account coverage model and prioritizing Tagger enablement for all of our customer-facing teams."  Despite having pursued, purportedly successfully, the move "upmarket" for years, and in contrast to the Company's prior statements, Defendants finally revealed "we are definitely seeing lengthening of our sales cycles, as the composition of our customer base . . . is changing."

13.     Analysts were incredulous.  For example, Cantor Fitzgerald reminded investors that the Company "announced its move to go up-market" long before 2024, and "thus the execution issues it is now facing, which are a result of its [go-to-market] strategy, should have been apparent much earlier than today."  Analysts at Jefferies were "puzzl[ed] [with] the disconnect between the actions that were taken at the beginning of the year[], the subsequent issuance of full[-]year guidance on 2/21, and now a material guide down."

14.     On this news, the price of Sprout Social stock plunged 40.1%—from a closing price of $48.15 per share on May 2, 2024, to a closing price of $28.82 per share on May 3, 2024— wiping out a substantial amount of shareholder value.

**JURISDICTION AND VENUE**

15.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange

Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17

C.F.R. § 240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §§ 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

17.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section

27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud

or the effects of the fraud have occurred in this Judicial District.  Many of the acts and omissions

charged herein, including the dissemination of materially false and misleading information to the

investing public, and the omission of material information, occurred in substantial part in this

Judicial District, as Sprout Social is headquartered in this Judicial District.

18.     In connection with the acts, transactions, and conduct alleged herein, Defendants,

directly and indirectly, used the means and instrumentalities of interstate commerce, including the

U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

19.     Based in Hollywood, Florida, Plaintiff City of Hollywood Police Officers'

Retirement System administers a retirement benefit plan of approximately $390 million on behalf

of more than 700 active, retired, and deferred vested members and their beneficiaries.  As set forth

in the accompanying certification, incorporated by reference herein, Plaintiff purchased Sprout

Social common stock during the Class Period and suffered damages as a result of the federal

securities laws violations and false and/or misleading statements and/or material omissions alleged

herein.

20. Defendant Sprout Social is incorporated under the laws of Delaware with its principal executive offices located in Chicago, Illinois. Sprout Social's common stock trades on the Nasdaq Capital Market (the "Nasdaq") under the ticker symbol "SPT."

21. Defendant Justyn Howard is the Company's co-founder and CEO. On April 15, 2024, the Company announced that Howard will be transitioning to the role of Executive Chair of Sprout Social's Board, effective October 1, 2024.

22. Defendant Ryan Barretto has served as the Company's President since December 2020. On April 15, 2024, the Company announced that Barretto will become Sprout Social's CEO effective October 1, 2024.

23. Defendant Joe Del Preto ("Del Preto") was the Company's Chief Financial Officer ("CFO") at all relevant times.

24. Defendants Howard, Barretto, and Del Preto (collectively, the "Individual Defendants"), because of their positions with Sprout Social, possessed the power and authority to control the contents of, *inter alia*, Sprout Social's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of Sprout Social's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

25.     Sprout Social and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

26.     Sprout Social began operating in April 2010 to design, develop, and operate web-based social media management tools for companies to manage and measure their online presence. The Company operates across major networks, including X (formerly known as Twitter), Facebook, Instagram, TikTok, Pinterest, LinkedIn, Google, Reddit, Glassdoor, and YouTube and generates revenue primarily from subscriptions to its social media management platform under a software-as-a-service model. Sprout Social has more than 31,000 customers with subscriptions that range from monthly to one-year or multi-year arrangements. The Company's filings with the SEC during the Class Period informed investors the Company had "proven success in the SMB [small-and-medium sized businesses], Mid-market and Enterprise segments." Sprout Social defined "mid-market" to mean organizations with between 50 and 999 employees and "enterprise" as organizations with more than 1,000 employees.

27.     At the time of the Company's initial public offering in 2019, 60% of Sprout Social's business consisted of smaller customers on month-to-month contracts with a smaller portion of the business mix consisting of mid-market or enterprise customers. However, leading up to and during the Class Period, Sprout Social highlighted a change to its business mix, with the Company targeting larger customers on annual contracts. For example, months before the Class Period begins, on May 5, 2021, CFO Del Preto highlighted that the Company was "definitely seeing more[] enterprise and mid-market" customers willing to sign up for longer-term contracts, noting the shift to a "50-50 split between month-to-month and annual contracts[,]" with the Company expecting to "see that widening over the longer term."

28. Throughout the Class Period, Sprout Social included in its SEC filings its annualized revenue run-rate of subscription agreements ("ARR"). The Company informed investors that its ARR was a "Key Business Metric," and "an indicator of the scale of our entire platform while mitigating fluctuations due to seasonality and contract term."

**<u>Defendants' Materially False and Misleading Statements</u>**

29. After the close of the markets on November 2, 2021, Sprout Social issued a press release announcing financial results for the third quarter of 2021 and highlighting that revenue and ARR were up by 46% and 44%, respectively, compared to the same period in 2020. The press release quoted CEO Howard stating that the "outperformance this quarter was driven by accelerated momentum in our large-customer cohorts, underscoring the quality of our growth. We're pleased to deliver very strong ACV [annual contract value] growth and we see even greater future opportunities as our customers operationalize social." On the corresponding earnings conference call that day, CFO Del Preto stated, "[o]ur ongoing momentum into the mid-market enterprise and mix shift towards annual and multi-year contracts are each having a positive impact."

30. Defendants also touted the Company's "unique go-to-market strategy" during the earnings call. For example, CEO Howard highlighted that Sprout Social "managed to break a series of our own records this quarter driven by outsized momentum in the mid-market and enterprise segments, which are now collectively approaching 70% of our ARR." In response to an analyst question on what drove the large customer adds in the quarter, President Barretto stated that it was:

> great execution from those mid-market and enterprise teams. And then our marketing team has just done a wonderful job in really focusing in on going after these sophisticated buyers through our

SEO [search engine optimization] and content strategy. And so it's
provided us with a really healthy pipeline of big opportunities.

31.    Another analyst asked if the Company was "thinking about [] establishing direct

sales teams that are going to be a lot more outbound-focused and going after accounts maybe that

you haven't seen[.]"  In response, President Barretto emphasized that "you'll continue to see us

invest in the mid-market – the marketing approach as well as in capacity, but ***not a lot has to***

***change in our current motion.  We're doing a lot of those things that you mentioned at the***

***beginning of your question already today***."

32.    During the Barclays Global TMT Conference on December 7, 2021, when asked

what the drivers were for Sprout Social's accelerating growth, CFO Del Preto responded:

> I think there's a couple of things going on there. I think first, ***on the
> new business side, we've just seen an increased amount of
> execution from the sales team***. And there's a couple of things going
> on there. One is given the fact that we're 90% inbound with our trial
> model, right?  We have a lot of data and information.  We can
> understand the quality of those trials and leads and demos.  ***And so
> we've been able to more efficiently kind of get those out to the sales
> teams, have them work on the more higher value, more likely to
> close type opportunities.  So because of that, we've been just a little
> bit more efficient on the go-to-market side.  The other thing we're
> doing and this has probably helped us more in the mid-market
> enterprise as we're getting pulled more upmarket is, we started to
> make some changes in our marketing strategy and our content
> strategy***.  Historically, we've built a lot of our content, built out for
> the practitioner, how do you do things day-to-day.  But ***what we
> found is as we're getting pulled into more C-level conversations,
> we're getting these larger enterprises with CMOS, heads of
> customer care.  We're starting to build out more of our content
> that's targeted to more of that senior level person at these
> organizations.  So because of that, we're getting into more of these
> conversations, more of these larger deals, and so that's kind of led
> to that growth***.

33.    During the same call, when asked about whether the Company needed to adjust to

different sales models for smaller and larger clients, President Barretto explained that:

*one thing that I think is really important here is that we are doing both of those things today. So we have that inbound motion that's been a huge part of the foundation and the DNA of the organization and we've complemented that with outbound sales as well. And that's a big part of our mid-market and enterprise play today*.

34.     After the markets closed on February 22, 2022, Sprout Social issued a press release announcing its financial results for the fourth quarter of 2022, which again were above expectations as revenue and ARR increased 43% and 42%, respectively, compared to the same quarter in the prior year. During the earnings call later that day, CEO Howard highlighted that the Company was "seeing great progress across all segments of our market, with our focused investments in the mid-market and enterprise leading to our strongest quarter as a public company." President Barretto also explained that Sprout Social was:

taking the friction out of customer adoption and accelerating our product-led sales motion to deliver an even more efficient go-to-market model, and we're doing it at scale. *While our current execution remains incredibly strong, our enterprise and mid-market teams dropped the mic during Q4. Our investments in sales capacity, onboarding and success have been well aligned to the inbound customer demand signals we've seen*.

35.     President Barretto later noted that "we're still running at a sales cycle that runs between 30 to 45 days on average. And we will see deals in the mid-market and enterprise that hit those time lines[,]" explaining that Sprout Social's go-to-market strategy "creates rapid sales cycles for us."

36.     When asked if there are "any major technical areas or lack of certain feature sets in your offering today that you feel still notable headwinds to . . . landing larger customer deals[,]" CEO Howard emphasized that "*we're well equipped for the deals that are out there. . . . So there's not anything that we would look to and put on the board as deficiencies[.]*"

37.     After the markets closed on May 3, 2022, Sprout Social issued a press release announcing its financial results for the first quarter of 2022. The results were positive as revenue and ARR grew 41% and 39%, respectively, compared to the same quarter in the prior year. The press release quoted CFO Del Preto noting that:

> *[o]ur go-to-market investments are paying off now, and our product investments are expanding our foundation for durable growth*. Following another quarter of solid execution and with a strong pipeline, we are pleased to raise our 2022 guidance and expect to deliver faster growth with better efficiency than our prior forecast.

38.     During the related earnings call, President Barretto told analysts that "our mid-market and enterprise teams continue to deliver outstanding new business performance in what is typically a seasonally slower enterprise quarter." President Barretto then pointed out the sizable growth opportunity for the Company, stemming from the "combination of increasing use cases, expanding seat counts, rising premium module attach rates, and *the steady drumbeat of upmarket expansion*[.]"

39.     Following the close of the markets on August 2, 2022, the Company issued a press release announcing its financial results for the second quarter of 2022. The results were again positive as revenue and ARR increased 37% and 35%, respectively, compared to the second quarter of 2021. CFO Del Preto was quoted in the press release emphasizing that:

> [o]ur business model is resilient, *our execution is consistent and we have high confidence in the durability of our near and long term growth. Behind strong execution and record enterprise new business pipeline, we are pleased to raise our 2022 guidance and expect to deliver 100bps faster growth, with better efficiency than our prior forecast*.

40.     On the earnings conference call that same day, CEO Howard noted that "the consistency of this performance and durability of our growth this quarter was driven by outsized

contributions from our mid-market and enterprise segments." Later on, CEO Howard highlighted that:

> we're continuing to see the shift that really started kind of in ***the middle of last year where our emphasis and investment priorities have really become more focused on the mid-market and enterprise***. And we're seeing some mix shift in the customer base, not only in the new lands, but also in the top of the funnel and the people that we're targeting. And swapping out some of the highest volume, lower end of the market opportunities with some of the bigger ones, which you're seeing in the momentum that we've got in the mid-market and the enterprise[.]

41. After the close of the markets on November 3, 2022, Sprout Social issued a press release announcing its financial results for the third quarter of 2022. The press release noted that revenue and ARR each increased 33% compared to the third quarter of 2021, and quoted CFO Del Preto highlighting that "[o]ur execution remains strong and our business model continues to highlight its resiliency. As we begin to appropriately monetize our platform with announced pricing changes throughout Q4, we expect ACV growth to meaningfully accelerate into and through 2023."

42. On the accompanying earnings call later that day, an analyst asked the Company about "the enterprise customer mix, are you looking to make any changes around the go-to-market or the sales motion, either with more upon sales hires or enterprise-focused sales individuals?" In response, President Barretto stated:

> ***We're already doing a lot of those things today***. So it's probably just continuing to invest there. So if I think about just the teams themselves, we have some great enterprise leadership and sellers that are already in the marketplace today that are closing a lot of these accounts or growing these accounts that we've spoken about. We're continuing to invest on those teams. We see a tremendous opportunity in front of us from a marketing perspective. You'll see a lot of our focus and investment going into marketing to those large, sophisticated customers, forms of things like account-based marketing. We also have continued to grow our outbound BDR

13

teams that are building pipeline within those accounts. ***And I also underline, even though we're doing all those traditional enterprise strategies***, we also still leverage the product like we always have. So our customers continue to come in and trial the product and that continues to be a major differentiator for us even in the enterprise, and it's one of our number one plays is get their hands on the keyboard. And so for us, we love that in the enterprise, massive differentiator, and so we'll continue to be working on that as well.

43. During the Barclays Global Technology, Media, and Telecommunications conference held on December 7, 2022, CFO Del Preto claimed "we haven't seen a major change in the way we win new business. It's still 90% of it comes inbound, even up in the mid-market enterprise." Further, when asked by an analyst how Sprout Social "create[s] flexibility[y]" in uncertain business environments, CFO Del Preto assured investors that "we have pretty good indications on how to manage this in uncertain times," pointing specifically to a "***tight sales cycle***[,]" which gives "a pretty good understanding of how quickly those investments are working or not working."

44. Following the market close on February 21, 2023, Sprout Social issued a press release with its financial results for the fourth quarter of 2022. The Company highlighted that revenue and ARR grew 31% and 42%, respectively, compared to the fourth quarter of 2021. CEO Howard was quoted in the press release stating that Sprout Social "achieved multiple new high water marks in both new business and expansion, led by outstanding new business momentum in the enterprise. Our pricing changes are performing well, our partnerships are strengthening and social has never been more critical to our customers." Additionally, CFO Del Preto emphasized that "[t]he quality of our financial model is improving as we continue to deliver durable, efficient growth. Led by very strong momentum in the mid market & enterprise, successful monetization changes and a rapidly maturing market opportunity, we expect to deliver accelerating ARR growth in 2023."

45.     On the earnings conference call, President Barretto highlighted that one of the factors "contributing to the success that we're continuing to see in the enterprise" was that:

> *[O]ur teams have done an amazing job both driving awareness in the enterprise, but also executing really well against these opportunities, going out and building pipeline with these accounts, taking great care of these customers through the evaluation process as well as when we win them and making sure that they get implemented quickly and that they're getting great user adoption*.

46.     Later on during the same earnings call, when asked if the "trial-led go-to-market model resonate[s] as well at the high end of the market[,]" President Barretto proclaimed that "we are incredibly excited about that trial motion, especially in the enterprise, because it is incredibly differentiated. *Most enterprise solutions, certainly in our space, but I think in many software categories, don't lead with a product in the enterprise. They usually lead with really heavily customized demos and really long sales cycle times and heavy services. And that's the opposite of the way that we approach the market*."

47.     After the close of the markets on May 2, 2023, the Company issued a press release announcing its financial results for the first quarter of 2023. The results were again positive as revenue and ARR increased 31% and 30%, respectively, compared to the first quarter of 2022. During the earnings conference call for the quarter, CEO Howard highlighted that "the shift away from our inefficient low-end business, consistent growth in the healthiest tiers of our business and renewed top-of-funnel demand through March and April positively impacted net new ARR performance in April with enterprise being a positive outlier." Later on during the same earnings call, President Barretto noted that:

> *[f]rom a customer success perspective, we shifted some of those resources that were on the noncore business up into the strategic customers in mid-market and enterprise. So we're doing a much better job there as well*, helping those customers, improving the ratios and enabling us to not just improve that gross retention but

also to give us a lot more of a foundation to expand from, so investments going through all of those today. ***In terms of the dynamics of what's changed on the sales motion, it's a lot of the same things that we've historically been doing***. We've been adding more talent that's been used to selling in the enterprise.

48.     Following the close of the markets on August 3, 2023, Sprout Social issued a press release announcing its acquisition of Tagger, a leading influencer marketing and social intelligence platform, for cash consideration of $140 million "funded with a combination of cash from Sprout Social's balance sheet and Sprout's newly established revolving credit facility." The Company noted the acquisition "expands Sprout Social into the influencer marketing category and extends social media platform to deliver comprehensive workflow, reporting and intelligence."

49.     On the conference call with investors later that day, CEO Howard stressed the importance of the acquisition of Tagger, because "[i]nfluencer and creator marketing has quickly increased in customer demand given how critical this category has become to a brand's awareness and brand strategy[,]" noting that customers mentioned "influencer marketing in ***more than half of our enterprise RFPs***." President Barretto highlighted that the Company "knew immediately that Tagger would make for an incredible fit with Sprout. . . . We believe our depth and scale will allow Tagger's products to innovate and grow at an accelerated pace, and our go-to-market motion is perfectly suited to accelerate Tagger's growth and drive even more customer success." President Barretto later highlighted that with Tagger:

> ***[F]rom a sales cycle perspective, the other piece that was just exciting for us is as we spent time with the go-to-market team, their sales cycles aren't quite as rapid as ours with our trial model, but they're fast for enterprise. And we believe that from what we've seen and how we're running the rest of our cycles that they can attach nicely in the work that we're doing without elongating our core business***.

50.     President Barretto also confirmed that "***influencer [marketing] is a customer requirement showing up in more than half of our enterprise conversations***." President Barretto

added that "Tagger's ACVs are meaningfully above Sprout's, and we believe will now have the most comprehensive and competitively differentiated set of solutions in each of our markets[,]" emphasizing that "our new business win rates and ACVs are set to move higher in our core business as we combine forces." These revelations meant that Sprout Social previously did not have the ability to address a critical need for the majority of its target market.

51. Analysts at Cantor Fitzgerald were skeptical of the cost Sprout Social paid for Tagger. They explained that the acquisition "further complicates the story, as there is a lot of noise surrounding [Sprout Social's] customer count and go-to-market strategy," and noted that although there are potential benefits and opportunities arising from the acquisition, the analysts "***cannot overlook the opportunity cost associated with a $140m purchase price for a company that is projecting ~$6m of revenue in 2023E and ~$15m in revenue for 2024E***." Because the estimated annual interest expense on the funds used to purchase Tagger was $6 million to $8 million, the Company was "***likely to pay more in interest expense in 2024E than the revenue that Tagger is going to generate in 2023E (~$6m)***." Analysts at Piper Sandler were similarly perplexed about what the Tagger acquisition meant in terms of how the Company was landing enterprise customers, as the "biggest outstanding question is on the enterprise pipeline in the back half" of the year. Analysts at CG Capital Markets similarly queried whether Sprout Social was "making an acquisition to mask deteriorating growth."

52. On this news, the price of Sprout Social stock fell 12.3%—from a closing price of $53.38 per share on August 3, 2023, to a closing price of $46.81 per share on August 4, 2023—on extraordinary trading volume. However, Sprout Social continued to misrepresent its ability to and success in shifting its customer mix to enterprise customers on larger, annual contracts.

53.     Defendants continued to tout the Company's ability and success in the move "upmarket" while maintaining its rapid sales cycle.  For example, during the Company's Investor Day on September 27, 2023, when asked if there would be any changes to the sales team staffing and resources due to the growing mid-market and enterprise business, President Barretto answered:

> [T]he short answer is just the go-to-market motion is the exact same for us. . . .  We lead with the product, we lead with the trial.  Our entire team is enabled on understanding the entire ecosystem and the integrations that we have across a variety of technology platforms.  And to Justyn's point, we -- *as we were focusing in more on the more sophisticated customers.  We shifted headcount internally as we turned the year and wanted this year to make sure that we felt really great about the capacity that we had in places like mid-market and enterprise and places like solution engineering that support the enterprise and places like customer success that we're supporting some of our larger customers*.

54.     After the close of the markets on November 2, 2023, Sprout Social issued a press release announcing its financial results for the third quarter of 2023.  The results included revenue increasing 31% and ARR increasing 33% compared to the same quarter of 2022.  The press release also included a quote from CFO Del Preto noting that the Company's "current performance and leading indicators performed well during Q3 led by the rapidly changing mix of our business and further acceleration in our enterprise segment.  Tagger overperformed our expectations right out of the gate."

55.     On the earnings call later that day, CEO Howard discussed Tagger:

> Business integration has also progressed smoothly and early customer reception to Tagger has far exceeded our expectations.  Our teams and our products have felt like cousins from the start and we now have differentiated value proposition to deliver for an expanding set of new customers and customer excitement inside our installed base has been headlined by very large enterprise bands[.]

56.     Later on during the same call, when an analyst asked "what kind of trends you're seeing in sales cycles as you move really up into that kind of large enterprise bucket[,]" President

Barretto claimed that due to the Company's trial model, "even in enterprise deals that might come from RFPs, ***we generally have a faster sales cycle than you might see with other enterprise software players***, both in our space and outside of it, because customers are in the product by the time they make a decision."

57.     Similarly, when asked what the Company learned as they've grown the sales team, President Barretto noted other differentiators Sprout Social has over its competitors for obtaining enterprise customers, stating that:

> [W]hen we think about the profile of the enterprise reps that we have on our team, clearly they have some great skills around understanding social and best practices for the enterprise. ***Our deals move faster than most enterprise organizations***, so we expect those reps to have a certain level of speed to them in the way that they execute and to manage more accounts and transactions and deals than they might have at another legacy enterprise player. ***So the speed and velocity of our business as well as the depth and understanding business strategy is really important for our enterprise team and we're seeing really good success as demonstrated in the logos that our team is being able to win***.

58.     After the markets closed on February 20, 2024, Sprout Social issued a press release announcing its financial results for the fourth quarter of 2023. The press release noted that revenue increased 34% and ARR increased 30% compared to the same quarter in the prior year. During the related earnings call, President Barretto noted that:

> ***customers are highlighting to us that they're seeing our competitors investing less in their teams, in their customers and in their products. This is reinforcing the strength of our strategy and our differentiation***. You can see this in the usability of our platform and how leading with the product has become the primary driver in our strengthening win rates in the enterprise.

59.     When asked how staff was being repurposed or utilized inside the Company as they deemphasize their focus on smaller customers, President Barretto noted that "a ***lot of that transition was happening throughout '23***[,]" giving "***a lot more focus to the marketing team on***

*the places that we really want to drive inbound pipeline and opportunity, even the marketing strategies upmarket in the mid-market and enterprise and the approaches we could take*." President Barretto further explained:

> [i]f you're not handholding really small customers that may not truly understand social who, by the way, end up taking up as much resources oftentimes as the enterprise, you're able to redeploy your resources to focus in on those more social-first sophisticated customers. So we're seeing it across the board. And I think the best way to just think about it is the redeployment of our resources towards those sophisticated customers in the core.

60. More than two months into the Company's first quarter of 2024, during a March 6, 2024 Keybanc Emerging Technology Summit, an analyst asked about the "velocity of the sales cycle upmarket." President Barretto responded that "even in the mid-market and enterprise, there's great velocity in our business."

61. The above statements in paragraphs 29 through 60 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects to make the statements made, in light of the circumstances under which they were made, not false and misleading. Specifically, Defendants failed to disclose that Sprout Social: (1) did not have the ability to sell its software to enterprise customers; (2) did not execute on its purported go-to-market strategies for enterprise customers; (3) was forced to overpay for Tagger to even satisfy the requirements of enterprise customers; (4) as a result of the Company's move "upmarket," the Company was experiencing longer sales cycles and poor pipeline generation; and (5) as a result of the above, Defendants' statements about Sprout Social's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Is Fully Revealed**

62.     The truth was fully revealed to the market after the close of the markets on May 2, 2024, when Sprout Social issued a press release announcing financial results for the first quarter of 2024, which included a $20 million downward revision to 2024 revenue guidance.  The press release quoted CFO Del Preto, who explained that Sprout Social "underestimated the magnitude of enterprise seasonality that now comes with our business mix, while also ***self-inducing sales execution headwinds*** during Q1 [the first quarter of 2024] that we believe were important to position us for future success."

63.     During the corresponding analyst call that day, President Barretto disclosed that the Company "made several important strategic decisions heading into Q1 such as building new vertical sales teams, accelerating promotions in our midmarket and enterprise teams, adjusting our account coverage model and prioritizing Tagger enablement for all of our customer-facing teams." President Barretto admitted that the Company "thought we could manage these changes without disruption, but they collectively set us back."  President Barretto further disclosed that "the decisions on all of this happened in Q4 [the fourth quarter of 2023] and the execution of it happened in Q1."  President Barretto specifically "call[ed] out" a few problems that contributed to the poor results, including "introduc[tion of] some new teams and changing some of the account coverage and taking the team off the floor for enablement," as well as a "focus [] in Q4 with execution versus building pipeline for Q1."  Thus, despite years of touting the Company's investments into its go-to-market strategy and capabilities to acquire enterprise customers, Defendants admitted that rudimentary necessary enhancements to its enterprise sales process were only being made at the tail end of 2023, which greatly affected Sprout Social's performance in the first quarter of 2024.

64.     During the same earnings call, President Barretto reported that Sprout Social is:

*now enterprise-heavy and the linearity of our business has changed materially, which affects our revenue recognition and planning. Our months, quarters and years are now more heavily weighted to traditional enterprise buying cycles. We underestimated the magnitude of this shift and the quickly changing dynamics in our customer mix*.

65.     Despite previously emphasizing the Company's fast sales cycles with enterprise customers, President Barretto surprisingly stated that "***we are definitely seeing lengthening of our sales cycles***, as the composition of the customer base and the prospect base is changing" and that the "lengthening of the cycle is a dynamic in our business."

66.     CEO Howard also disclosed during the call that the Company had to spend "energy and calorie[s]" in the first quarter on "tactical decisions," including "spending time with the team on Tagger enablement[,]" noting that "[f]rom a sales team perspective, the maturity of the sales team, we did a lot of enablement in Q1 across our entire customer-facing or[g] to make sure that we are up to speed with all of the elements of influencer in our Tagger platform."

67.     Numerous analysts eviscerated the Company following the earnings release and call. For example, analysts at Cantor Fitzgerald pointed out that Sprout Social had "announced its move to go up-market" well before 2024, and "thus the execution issues it is now facing, which are a result of its [go-to-market] strategy, should have been apparent much earlier than today." Additionally, Jefferies analysts noted that the Company was "increasingly focused on selling its products and services upmarket to enterprises," but "[w]hile the transition appeared to be going reasonably smoothly, the results this quarter are a stark reminder that change is never easy. More puzzling is the disconnect between the actions that were taken at the beginning of the year[. . .], the subsequent issuance of full year guidance on 2/21, and now a material guide down."

68.     Analysts at Baird wrote that "Sprout surprised us by lowering 2024 guidance, citing execution challenges in the shift up-market to enterprise. The company is still making changes to

the go-to-market team and expects to hire a new CRO to report to new (incoming) CEO Ryan Baretto." Similarly, William Blair analysts highlighted that the Company's "[s]elf-induced execution challenges in go-to-market also contributed to the miss. A large part of this appeared to be driven by Sprout's move upmarket, which is necessitating a change in its go-to-market motion to be more enterprise oriented. On this front, the company is building new vertical sales teams, adjusting sales coverage model, and investing in enablement."

69. Along those same lines, Barclays analysts reported on "a few key issues [] impacting the growth for the business and most have to do with the upmarket move." As an example, the analysts noted that "although pipeline was cited to be strong coming into the year on an absolute basis, the enterprise cycles are longer and deals were not able to closed in the quarter."

70. As investors digested this disclosure, the price of Sprout Social stock plummeted 40.1% in a single day—falling from a closing price of $48.15 per share on May 2, 2024, to a closing price of $28.82 per share on May 3, 2024—on extraordinary trading volume.

## CLASS ACTION ALLEGATIONS

71. Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Sprout Social securities between November 3, 2021 and May 2, 2024, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers, and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

72. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least

hundreds or thousands of members in the proposed Class. Throughout the Class Period, Sprout Social shares actively traded under the symbol "SPT." Millions of Sprout Social shares were traded publicly during the Class Period on the Nasdaq. As of April 26, 2024, the Company had 49.8 million shares of Class A common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Sprout Social or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

73. Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

74. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests that conflict with those of the Class.

75. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

b) whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

c) whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders misrepresented material facts about the business, operations, and prospects of Sprout Social;

24

d)     whether statements made by Defendants to the investing public misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of Sprout Social;

e)     whether the market price of Sprout Social shares during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f)     the extent to which the members of the Class have sustained damages and the proper measure of damages.

76.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## UNDISCLOSED ADVERSE INFORMATION

77.     The market for Sprout Social securities was an open, well-developed, and efficient market at all relevant times. As a result of the materially false and/or misleading statements and/or omissions particularized in this Complaint, Sprout Social's securities traded at artificially inflated prices during the Class Period. Plaintiff and the other members of the Class purchased and/or acquired Sprout Social's securities relying upon the integrity of the market price of the Company's securities and market information relating to Sprout Social and have been damaged thereby.

78.     Defendants materially misled the investing public, thereby inflating the price of Sprout Social securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because

they failed to disclose material adverse information and/or misrepresented the truth about Sprout Social's business, operations, and prospects as alleged herein. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its business, thus causing the Company's securities to be overvalued and artificially inflated or maintained at all relevant times. Defendants' materially false and/or misleading statements directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class who purchased and/or acquired the Company's securities at artificially inflated prices and were harmed when the truth was revealed.

## SCIENTER ALLEGATIONS

79.     As alleged herein, Defendants acted with scienter in that Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

80.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Sprout Social, their control over, receipt, and/or modification of Sprout Social's allegedly materially misleading statements and omissions, and/or their positions with the Company, which made them privy to confidential information concerning Sprout Social, participated in the fraudulent scheme alleged herein.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

81.     As a result of their purchases and/or acquisitions of Sprout Social's securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

82.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Sprout Social who knew that the statement was false when made.

## LOSS CAUSATION

83.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

84.     First, on August 3, 2023, Sprout Social announced that it had acquired Tagger for $140 million and revealed that Tagger's capabilities were a "customer requirement showing up in more than half of our enterprise conversations." The next trading day, Sprout Social's stock price fell $19.33 per share—falling from $53.38 per share on August 3, 2023 down to $46.81 per share on August 4, 2024—constituting a 12.3% stock drop.

85.     Then, on May 2, 2024, Sprout Social announced its financial results for the second quarter of 2024, which included a $20 million downward revision to the Company's revenue guidance for 2024 resulting from "self-induc[ed] sales execution headwinds[.]" The next trading day, Sprout Social's stock price fell $19.33 per share—falling from $48.15 per share on May 2, 2024 down to $28.82 per share on May 3, 2024—constituting a 40.1% stock drop.

86. As detailed herein, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive the market. This artificially inflated the prices of Sprout Social securities and operated as a fraud or deceit on the Class. When Defendants' prior misrepresentations, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of Sprout Social's shares fell precipitously, as the prior artificial inflation came out of the price.

<u>**APPLICABILITY OF PRESUMPTION OF RELIANCE**</u>
<u>**(FRAUD-ON-THE-MARKET DOCTRINE)**</u>

87. The market for Sprout Social securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, Sprout Social securities traded at artificially inflated and/or maintained prices during the Class Period. Plaintiff and other members of the Class purchased and/or acquired the Company's securities relying upon the integrity of the market price of Sprout Social shares and market information relating to Sprout Social and have been damaged thereby.

88. At all times relevant, the market for Sprout Social securities was an efficient market for the following reasons, among others:

a) Sprout Social was listed and actively traded on the Nasdaq, a highly efficient and automated market;

b) As a regulated issuer, Sprout Social filed periodic public reports with the SEC and/or the Nasdaq;

c) Sprout Social regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on

the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

        d)      Sprout Social was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

89.     As a result of the foregoing, the market for Sprout Social securities promptly digested current information regarding Sprout Social from all publicly available sources and reflected such information in the price of Sprout Social's securities. Under these circumstances, all purchasers and acquirers of Sprout Social securities during the Class Period suffered similar injury through their purchase and/or acquisition of securities at artificially inflated prices, and a presumption of reliance applies.

90.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded in Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects—information that Defendants were obligated to disclose but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## COUNTS AGAINST DEFENDANTS

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder Against All Defendants**

91.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

92.  Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Sprout Social securities; and (iii) cause Plaintiff and other members of the Class to purchase and/or acquire Sprout Social securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

93.  Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers and acquirers of the Company's securities in an effort to maintain artificially high market prices for Sprout Social securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

94.  Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Sprout Social's

business, operations, and prospects, as specified herein. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Sprout Social's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Sprout Social and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers and acquirers of the Company's securities during the Class Period.

95.    Each of the Individual Defendants' primary liability and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

96.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Sprout Social's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its securities.  As demonstrated by Defendants' misstatements of the Company's business, operations, and prospects, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

97.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Sprout Social securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the markets in which the securities trade, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Plaintiff and the other members of the Class purchased and/or acquired Sprout Social securities during the Class Period at artificially inflated prices and were damaged thereby.

98.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the truth regarding the problems that Sprout Social was experiencing, which were not disclosed by Defendants, Plaintiff and other members of

the Class would not have purchased or acquired their Sprout Social securities, or, if they had purchased or acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

99.     By virtue of the foregoing, Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

100.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases and acquisitions of the Company's securities during the Class Period.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act**
**Against All Individual Defendants**

101.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

102.    The Individual Defendants acted as controlling persons of Sprout Social within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

103.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

104.    As set forth above, Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases and acquisitions of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

105.    WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

a)    Declaring this action to be a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)    Awarding Plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

c)    Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d)    Awarding such other and further relief as this Court deems appropriate.

## JURY DEMAND

106.    Plaintiff demands a trial by jury.

Dated: July 2, 2024                              Respectfully submitted,

                                                 By: */s/ Carol V. Gilden*
                                                 **COHEN MILSTEIN SELLERS & TOLL PLLC**
                                                 Carol V. Gilden (Bar No. 6185530)
                                                 190 South LaSalle Street
                                                 Suite 1705
                                                 Chicago, IL 60603
                                                 Tel.: (312) 629-3737
                                                 Fax: (312) 357-0369
                                                 cgilden@cohenmilstein.com

                                                 *Liaison Counsel for Plaintiff City of Hollywood*
                                                 *Police Officers' Retirement System*

                                                 **SAXENA WHITE P.A.**
                                                 Lester R. Hooker
                                                 7777 Glades Road, Suite 300
                                                 Boca Raton, FL 33434
                                                 Tel.: (561) 394-3399
                                                 Fax: (561) 394-3382
                                                 lhooker@saxenawhite.com

                                                 Rachel A. Avan (*pro hac vice* forthcoming)
                                                 Marco A. Dueñas (*pro hac vice* forthcoming)
                                                 10 Bank Street, Suite 882
                                                 White Plains, NY 10606
                                                 Tel.: (914) 437-8551
                                                 Fax: (888) 631-3611
                                                 ravan@saxenawhite.com
                                                 mduenas@saxenawhite.com

                                                 *Counsel for Plaintiff City of Hollywood*
                                                 *Police Officers' Retirement System*

                                                 **KLAUSNER KAUFMAN JENSEN**
                                                 **& LEVINSON**
                                                 Robert D. Klausner
                                                 7080 NW 4th Street
                                                 Plantation, Florida 33317
                                                 Tel.: (954) 916-1202
                                                 Fax: (954) 916-1232
                                                 bob@robertdklausner.com

*Additional Counsel for Plaintiff City of Hollywood
Police Officers' Retirement System*